**EQUITABLE GAS COMPANY, A DIVISION OF EQUITABLE RESOURCES, INC., Plaintiff,**

v.

**UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC; and United Steelworkers of America, Local Union 12050, Defendants.**

Civ. A. No. 87–0940.

United States District Court,
W.D. Pennsylvania.

Dec. 30, 1987.

Henry J. Wallace, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiff.

Rudolph L. Milasich, Jr., Asst. General Counsel, United Steelworkers of America, Pittsburgh, Pa., for defendants.

## MEMORANDUM OPINION

COHILL, Chief Judge.

Presently before us are cross-motions for summary judgment. By its complaint and summary judgment motion, plaintiff Equitable Gas Company seeks to have this Court vacate an arbitration decision made pursuant to its collective bargaining agreement with the defendants United Steelworkers of America, AFL–CIO–CLC, and United Steelworkers of America, Local Union 12050. The defendants' motion seeks to have the arbitration award upheld. There being no dispute as to the facts, the case is ripe for decision by summary judgment. For the reasons set forth below, we will decline to vacate the arbitration award. However, we will remand this case to arbitration for further adjudication in accordance with this Opinion.

## I. FACTS

On January 7, 1985, the plaintiff and the defendants entered into a collective bargaining agreement covering the terms of employment for certain hourly employees in plaintiff's distribution and technical services department. *See* Exhibit A of the Complaint. The plaintiff is a public utility engaged in the sale and distribution of natural gas. James Bivens, the grievant involved in the underlying dispute in this case, was an employee of the plaintiff and was covered by the collective bargaining agreement.

The following account of how the dispute in issue arose is that of the arbitrator. *See* Exhibit B of the Complaint. The grievant was hired by the plaintiff in 1967 and was a

"Leakage Survey Crewman." His assignment was to locate leaks in gas lines maintained by the plaintiff. On May 14, 1986, Mr. Bivens suffered a neck injury while off-duty. As a result of this injury, he did not immediately return to work and sought and received benefits under the plaintiff's Non–Occupational Illness or Injury Allowance Policy (Allowance Policy). This policy is set forth in Appendix 3 of the collective bargaining agreement. It provides for salary continuation in various amounts and durations for bargaining unit employees who are absent from work due to non-occupational illness or injury.

On May 27, 1986, the grievant was examined by a physician employed by the plaintiff. After the examination, the grievant was told to return to work the following day. The grievant did not do so. Instead, he notified the plaintiff that he was unable to work due to pain and occasional numbness in his left arm and neck. The plaintiff then directed him to report for further medical evaluation at 9:00 a.m. on May 29, 1986.

Mr. Bivens failed to keep this appointment. At 2:30 p.m. on May 29, he called the plaintiff and explained that he had taken pain pills the night before and had accidentally slept through his appointment. The plaintiff rescheduled the appointment for May 30. Prior to the grievant's arrival the next day, the plaintiff made the decision to conduct a drug test on the grievant. At the examination, Mr. Bivens was directed to provide a urine sample. He at first complied but then discarded the sample when he was informed that the sample would be tested for drug residue. He then refused to submit to further examination.

On June 3, 1986, the plaintiff notified the grievant by letter that his actions violated the Allowance Policy and that payment to him under the policy was being discontinued as of May 28, 1986. Mr. Bivens did not respond to this notice. On June 11, 1986, he initiated a grievance with the plaintiff to recover the policy benefits. The plaintiff denied the grievance.

On June 13, 1986, the plaintiff sent a second notice. The letter instructed Mr. Bivens to contact the plaintiff to arrange a meeting with plaintiff's medical director before June 20, 1986. He was also told to supply documentation from his physician to substantiate his absence from work. The plaintiff also noted that the grievant would be required to submit to any medical tests requested by the medical director. The grievant was told that he would be fired if he failed to comply with the plaintiff's demands.

Mr. Bivens appeared for a medical examination on June 20. He was asked to sign a release authorizing drug testing and he refused. He was then told that there would be no examination without authorization for the drug test and he left without undergoing any examination. On June 25, 1986, plaintiff sent Mr. Bivens a notice of discharge. The notice stated that he was being terminated in light of his job responsibility of locating leaks of a lethal commodity, his refusal to submit to an examination by plaintiff's doctor on June 20, 1986, his continuing absence from work and his failure to comply with the requirements set forth in the letter of June 13, 1986.

Subsequent to his firing, Mr. Bivens filed a second grievance claiming that his discharge was not supported by just cause. The plaintiff denied the grievance and the claim was presented to arbitrator Richard Dissen.

## II. THE ARBITRATOR'S AWARD

Arbitrator Dissen issued his Opinion and Award on April 9, 1987. His analysis focused on two issues; (1) whether the plaintiff properly discontinued payments to the grievant under the Allowance Policy, and (2) whether the plaintiff properly terminated the grievant.

Addressing the first issue, Arbitrator Dissen recognized that in certain circumstances employers may demand that an employee undergo drug testing or risk termination. He discussed numerous cases wherein drug testing was found warranted where the employer became suspicious of the employee's behavior while at work. He

distinguished those cases from the circumstances presented here;

> In the instant case, management's insistence upon a drug screen cannot be perceived as an action taken to protect its operations from the imminent hazard of having an impaired employee on the job. The Grievant was not at work or even attempting to report to work. The Grievant was off work and, apparently, hoped to remain off work for some additional period of time. The Grievant's condition, whatever it may have been, posed no imminent threat to the Company's operations.

Arbitrator Richard Dissen's Opinion and Award, p. 10–11.

Arbitrator Dissen also found it significant that the grievant was not alleged to have had any known history of drug dependence or to have engaged in any erratic on-the-job behavior. He found that the May 29 incident could not be regarded as any indication of an ongoing drug problem that warranted investigation. Although the grievant had had a greater than average number of absences over the years, Arbitrator Dissen found this to be "only the scantest indictation of possible ongoing substance abuse." *Id.* at 11.

Section 1(A) of Appendix 3 of the Allowance Policy provides that an employee must comply with certain listed requirements in order to be entitled to an allowance. The sixth requirement is that the employee must permit examinations and inquiries by company medical representatives. The terms "examination" and "inquiries" are not further defined. Section 1(B)(2) of Appendix 3 provides that the injury or illness which causes an employee to be absent from work must not be the result of harmful drugs or intoxicants.

Based on arbitration precedent, Arbitrator Dissen found that a prerequisite to employee drug testing is some objective indication to the employer of more than a remote likelihood of impaired job performance. In this case, there was only "an isolated, off-the-job use of a drug by an employee who would not be returning to work immediately." *Id.* at 12.

He did concede that in light of Section 1(B)(2) the employer might be able to demand a drug test to determine whether the grievant's absence was due to drug usage. However, he found that there were less intrusive means than a drug test to determine the nature of the grievant's disabilities such as a physical examination, observation, and questioning. He opined that if these procedures had provided some additional evidence of drug usage then a drug test possibly could have been ordered.

Arbitrator Dissen then found that on May 30 the grievant breached the conditions of the policy by leaving the plaintiff's doctor's office upon learning that a drug test was scheduled; the grievant prevented the plaintiff from conducting any examination whatsoever. The grievant also failed to appear for a scheduled June 20 examination. Arbitrator Dissen thus held that for this period of time, the responsibility for any loss of benefits rested with the grievant since he had no right to refuse all examinations and still receive payments under the policy.

Arbitrator Dissen found, however, that on June 20 the plaintiff should have realized that the grievant was willing to submit to an examination which did not involve drug testing. Arbitrator Dissen found no evidence that on or after that date the plaintiff had extended a clear offer to the grievant to undergo an examination not involving drug testing; the plaintiff had made the drug test a prerequisite to obtaining any benefits. He thus found that the responsibility for the grievant's losses after June 20 must rest with the plaintiff. He held that the plaintiff's insistence on a drug test was not warranted or reasonable under the policy either to protect its operations or to protect its interests under the policy.

Concluding, the arbitrator found that although the grievant was entitled to benefits under the policy, no payment would be due for the period of May 28 to June 20, 1986. He additionally held that the grievant was to be reinstated to his former position and to be given back pay from June 21, 1986, to the date of the filing of

the grievance, July 8, 1986. We note that the plaintiff has reinstated the grievant but has continued to refuse to pay the back pay award.

## III. DISCUSSION

 It is well established that this Court's jurisdiction to review an arbitrator's decision is quite limited. Where the parties have agreed to have their disputes settled through arbitration, it is the arbitrator's findings of fact and interpretation of the contract that they have agreed to accept. *United Paperworkers International Union, AFL–CIO v. Misco, Inc.,* —— U.S. ——, ——, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). Where the contract has provided that the decision of the arbitrator is final and binding, courts are without jurisdiction to second guess the arbitrator's interpretation and application of the contract. *Wilmington Typographical Union No. 123 v. News–Journal Co.,* 513 F.Supp. 987, 989 (D.Del.1981).

 As long as the arbitration award "draws its essence" from the collective bargaining agreement, the courts have no business overruling the arbitrator merely because of a different interpretation of the contract. *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1982). The fact that this Court might not have made the same findings as the arbitrator or might not have evaluated the evidence as he did is not a sufficient basis to overturn an arbitration award as long as the arbitrator stayed within the confines of the agreement. *Kane Gas Light and Heating Co. v. International Brotherhood of Fireman and Oilers,* 687 F.2d 673, 681 (3rd Cir.1982), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1251, 75 L.Ed.2d 480 (1983). It is within the arbitrator's power to give reasonable and effective meaning to the intention of the parties considered against the backdrop of practices in the industry and the shop. *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1131 (3rd Cir. 1969).

 In the absence of fraud, partiality, or misconduct, a court should not review the merits of an arbitrator's award if the "interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop" may an award be vacated. *Id.* at 1128. The Supreme Court has recently stated that "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers,* —— U.S. at ——, 108 S.Ct. at 376. The award must be enforced even if the arbitrator has made mistakes of fact or mistakes of law. *Ludwig,* 405 F.2d at 1128.

 The first argument advanced by the plaintiff in support of an order vacating Arbitrator Dissen's award is that the award does not draw its essence from the collective bargaining agreement. It is contended that the language of the Allowance Policy clearly requires employees to submit to requested medical examinations in order to recover policy benefits. The plaintiff argues that Arbitrator Dissen injected his own notions of fairness into the agreement by imposing a requirement that the employer had to have suspicions based on fact concerning the grievant's drug use while on duty and/or definite safety concerns before requiring drug testing. We disagree.

It is certainly true that an arbitrator may not disregard or modify plain and unambiguous language in the collective bargaining agreement. *United Paperworkers,* —— U.S. at ——, 108 S.Ct. at 370; *NF & M Corp. v. Steelworkers,* 524 F.2d 756, 759 (3rd Cir.1975). We do not find, however, that the language of the Allowance Policy clearly permitted the plaintiff to demand a drug test.

Section 1(B)(2) of Appendix 3 provides that any non-occupational illness resulting from the use of harmful drugs is not a

covered illness under the Allowance Policy. Section 1(A)(6) of Appendix 3 provides that an employee must "[p]ermit examinations and inquiries by company medical representatives." The plaintiff argues that the language of these provisions makes it clear in that the plaintiff may demand drug testing in order to determine whether an employee's non-occupational illness is drug related. The policy does not, however, define the terms "examination" or "inquiries." Nor does it set limitations on the testing that the employer may require. Under the plaintiff's interpretation of the "plain language" of these provisions, any time an employee sought sick leave benefits the plaintiff would have unfettered discretion over whether, when, where, and how to test that employee for drug use regardless of his or her privacy or convenience concerns.

We would require much more specific language than that set forth in the Allowance Policy in order to find that the plaintiff was granted such unlimited power. The ability of employers to test employees for drugs is in no way a settled issue; legally or socially. Many argue that drug testing is a serious invasion of personal privacy and an affront to personal dignity. *See* Comment, *Urinalysis Drug Testing of Private Employees: A Call for Legislation in Pennsylvania,* 91 Dick.L.Rev. 1015, 1018–19 (1987). If the parties had agreed that the plaintiff have uncontrolled rights to test for drugs when an employee seeks sick leave benefits, we are convinced that more exacting language would have been used. Surely, we can not read this right into the general terms "examinations" and "inquiries" or the condition that benefits will be provided only where the off-duty illness is not drug-related. Section 1(A)(6) of the Allowance Policy did not in plain language give the plaintiff the right to uncontrolled drug testing of its employees when they seek Allowance Policy benefits.

Faced with language that did not expressly provide that employees seeking Allowance Policy benefits were required to submit to drug testing at the request of the plaintiff, Arbitrator Dissen was required to interpret the agreement to determine whether the plaintiff could order drug testing in this instance. He further had to determine whether the plaintiff had proper cause to fire an employee who refused to submit to the drug test. Confronted with the undefined terms "examination" and "inquiries," Arbitrator Dissen had no choice but to interpret their meaning in light of the law of the shop. This is precisely what the parties employed him to do.

Relying on arbitration opinions in other drug testing-related cases, Arbitrator Dissen interpreted the Allowance Policy as containing an implicit requirement that drug testing could only be ordered when; (1) the plaintiff had some indication that the employee's condition posed more than a remote likelihood of the employee's impaired job performance, or (2) some preliminary examination less intrusive than urinalysis provided evidence that an employee's extended absence was due to drug use. This interpretation draws its essence from the parties collective bargaining agreement.

While it is beyond our power to review the merits of that interpretation, we note that it is in accordance with the developing law in this area. *See, e.g., Gem City Chemicals, Inc.,* 86 Lab.Arb. (BNA) 1023, 1025 (1986) (Warns, Arb.) (Absent the application of a reasonableness test for employee drug testing, employees are asked to incriminate themselves without probable cause; this is an invasion of privacy and an unwarranted requirement to furnish confidential medical information); *Georgia Power Co.,* 87 Lab.Arb. (BNA) 800, 805 (1986) (Byars, Arb.) (Some degree of cause must be present before an employer has the right to require an employee to submit to drug testing). *See also* Denenberg & Denenberg, *Drug Testing From the Arbitrator's Perspective,* 11 Nova L.Rev. 371, 389 (1987) (discussion of the 1987 unpublished arbitrator's decision in *Association of Western Pulp and Paper Workers, Local 180 and Boise Cascade Corp.* wherein the arbitrator held that an employer may justify a demand for drug testing only where it has observed some overt behavior of the

employee relative to his job sufficient to establish probable cause that the employee is under the influence of drugs.). The agreement between the parties here does not provide that an employee seeking Allowance Policy benefits waives his rights of personal privacy.

Arbitrator Dissen held that the grievant's actions in this case did not provide the plaintiff with the level of suspicion necessary to order drug testing, and that the plaintiff did not have additional evidence resulting from a less intrusive examination to warrant drug testing. These findings must be upheld. Arbitrator Dissen was hired as a fact finder. Absent impropriety, his findings are final and binding.

■ The plaintiff's second argument in support of vacating the arbitrator's award is that the award violates public policy. Plaintiff contends that there is a public policy against the use of drugs in the workplace and that since this arbitrator's award permits an employee suspected of drug use to return to the critical job of inspecting pipes for gas leaks without further medical examination, the public policy is violated.

A court's refusal to enforce an arbitrator's award under a collective bargaining agreement because it is contrary to public policy is a specific application of the more general common law doctrine that a court may refuse to enforce contracts that violate public policy. *United Paperworkers*, — U.S. at ——, 108 S.Ct. at 373. This doctrine is founded upon the basic notions that a court will not lend its aid to one who bases a cause of action upon an illegal or immoral act and that the public's interest in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements. *Id.*

The Supreme Court has recently stated that courts may refuse to enforce arbitrators' awards allegedly in violation of public policy when, at the very least, two conditions are met. First, there must be a well-defined public policy found within the law and legal precedents; the court's decision should not be based on "general considera-tions of supposed public interests." *Id.* (quoting *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983)). Second, the violation of such policy must be clearly shown. *Id.*

The plaintiff has cited *S.D. Warren Co. v. United Paperworkers International Union*, 815 F.2d 178, 186 (1st Cir.1987) and state and federal legislation, for the proposition that there is a well-defined public policy against the use of drugs in the workplace. We note also, however, that there is a developing parallel public policy in favor of personal privacy and against employers' exercising unfettered discretion in testing for drugs. *See e.g., Gem City Chemicals, Inc.*, 86 Lab.Arb. (BNA) at 1025; *Georgia Power Co.*, 87 Lab.Arb. (BNA) at 805; Comment, 91 Dick.L.Rev. at 1018–19. This is especially true where the employer wants to test for an employee's off-duty drug use. *See* Denenberg & Denenberg, 11 Nova L.Rev. at 398 (Arbitrators have regarded off-duty misconduct as beyond the reach of the employer's disciplinary powers, except where the misconduct has a direct bearing on the employment relationship); Note, *Workers, Drinks, and Drugs: Can Employers Test?*, 55 U.Cin.L.Rev. 127, 132 (1986) (Courts and arbitrators are unwilling to permit employers to discipline employees for off-duty drug use since employers have no right to control the actions of employees outside the workplace unless those actions have a demonstrable effect on the employee's safe and effective job performance); Rust, *Drug Testing: The Legal Dilemma*, 72 A.B.A. Journal, Nov. 1, 1986, at 51, 52 (Opposition to employer testing for off-duty drug use is especially strong). It is not necessary for us to decide today at what point these policies merge. We are certain, however, that whatever the resulting public policy may be, it would not invalidate the decision of Arbitrator Dissen.

The arbitrator found that the grievant's drug use, if any, was an isolated incident by an employee who was not at work at the time of the alleged usage and who was not likely to return to work in the time immedi-

ately after such alleged usage. The arbitrator also found that the grievant had no known history of drug dependence or drug use. Further, there was no evidence that the grievant had ever engaged in any erratic on-the-job behavior. At most, the grievant had a greater than average number of absences from work.

■ We cannot find that the plaintiff has clearly shown that Arbitrator Dissen's decision to permit this grievant to return to work without further medical examination, in the absence of evidence that the grievant posed any threat to the safety of the public, his fellows employees, or himself, while on-the-job, violated any public policy against drug use in the workplace. A refusal to enforce an arbitration award on the grounds that it violates public policy "must rest on more than speculation or assumption." *Id.* — U.S. at —, 108 S.Ct. at 374.

Thus, to the extent that Arbitrator Dissen found that the grievant did not violate Section 1(A)(6) of Appendix 3 of the Allowance Policy by refusing drug testing on and after June 20, 1986, Arbitrator Dissen's award will be upheld.

■ The third argument set forth by the plaintiff is that Arbitrator Dissen failed to consider the other grounds upon which it relied when it denied the grievant allowance benefits and terminated him. We find merit in this argument.

The relevant part of Appendix 3 of the Allowance Policy provides;

It is Company policy to provide regular employees with economic security by providing allowances during periods when such employees who *qualify* must be absent from work due to non-occupational illness or injury.

1.A. Employee *must* comply with the following in order to be paid under Section III entitled allowance:

1. Notify his (or her) supervisor, prior to his regular starting time on the first day of absence and each successive day thereafter (unless excused by his supervisor), as to the nature of the illness or injury. If illness continues, in addition to

keeping his supervisor informed of his condition, he must inform his supervisor in advance of the date of his return to work.

2. Furnish, as soon as it is known, the name and address of the attending physician, hospital, nature of illness, or other significant information.

3. Follow the advice and direction given by his (or her) supervisor or other authorized management representative, including in cases of excessive or chronic absenteeism, presentation of a doctor's certificate or other medical evidence of disability for each absence. If the excessive or chronic absenteeism continues, the Company will take appropriate action.

4. Seek and follow competent medical advice for treatment of the illness or injury.

5. Notwithstanding Item 3 above, when an employee is absent three (3) consecutive working days or longer, he (or she) must present a doctor's certificate as evidence that he (or she) was examined, advised, or treated by such doctor during the absence. If such certificate is not received in the Personnel Department within seven (7) calendar days after the date on which the employee returns to work, the employee will be notified by letter from the Personnel Department. If the certificate is then not received in the Personnel Department within seven (7) calendar days from the date of the letter, the employee will not be paid for the days absent. Failure to provide required medical certificates, regardless of whether or not the employee was paid for such absence, will result in appropriate disciplinary action. In determining consecutive working days of absence for any employee, the provisions of Paragraphs 11.B and 11.E must be considered.

6. Permit examinations and inquiries by Company medical representatives.

Agreement Between Equitable Gas Company and United Steelworkers of America, AFL–CIO–CLC, and its Local Union 12050, p. 73 (emphasis added).

This was the issue presented to Arbitrator Dissen: "Whether management had proper cause to remove the Grievant from the payroll and, later, terminate the Grievant for his refusal to comply with the provisions of the Non–Occupational Illness or Injury Allowance Policy and to permit a reasonable and necessary medical examination." In the Statement on Behalf of the Company filed with Arbitrator Dissen, the plaintiff argued that the grievant made no effort whatsoever to explain his actions or take steps to protect his future employment. We find that Arbitrator Dissen was presented with the issue of whether the plaintiff was justified in denying benefits and terminating the grievant due to the grievant's failure to adhere to all of the requirements set forth in Section 1(A) of Appendix 3 of the Allowance Policy.

Arbitrator Dissen's opinion only discusses the medical examination requirement set forth in Section 1(A)(6) of Appendix 3. He failed to consider whether the grievant fulfilled the other five requirements listed in that section. We find this to be error.

Appendix 3 expressly provides that payment under the Allowance Policy is conditioned on an employee's fulfilling the six listed requirements. We are not presented with an adequate record upon which to make the necessary findings. Furthermore, it is the fact finding of the arbitrator that the parties agreed to abide by. We thus decline to make any determination as to whether the grievant fulfilled the remaining five conditions.

Pursuant to federal common law, a federal district court may remand a case to an arbitrator where the submitted issues are not fully resolved, *Oil, Chemical & Atomic Workers International Union, Local 4–367 v. Rohm & Haas, Texas, Inc.*, 677 492, 495 (5th Cir.1982), or where the arbitrator's award is incomplete, *United Steelworkers of America, District 36, Local 8249 v. Adbill Management Corp.*, 754 F.2d 138, 141 (3rd Cir.1985); *Hart v. Overseas National Airways, Inc.*, 541 F.2d 386, 392 n. 15 (3rd Cir.1976), or indefinite, *Americas Insurance Co. v. Seagull Compania Naviera, S.A.*, 774 F.2d 64, 67 (2nd Cir.1985). The United States Supreme Court has also recently noted that federal courts may remand arbitration awards for further proceedings "when this step seems appropriate." *United Paperworkers*, —— U.S. at —— n. 10, 108 S.Ct. at 372 n. 10.

We feel that a remand of the incomplete and unresolved arbitration award of Arbitrator Dissen in this case is an appropriate step. On remand, the arbitrator is to determine whether the grievant fulfilled conditions numbered one through five in Section 1(A) of Appendix 3, and if not, whether the plaintiff, within the confines of the agreement, properly responded to such failure.

There is one last matter for our consideration. The defendant Unions' request that we order the plaintiff to pay interest on the back pay awarded to the grievant and attorneys' fees due to the plaintiff's unjustified refusal to abide by the arbitration award. In light of our order to remand this action to arbitration, we decline to review this request at this time.

For the reasons set forth above, we will deny plaintiff's motion for summary judgment. We will grant the defendants' motion for summary judgment to the extent that Arbitrator Dissen held that the grievant did not violate Section 1(A)(6) of Appendix 3 of the Allowance Policy by refusing drug testing on and after June 20, 1986. We will remand this case to arbitration for proceedings consistent with this Opinion.

An appropriate order will issue.